UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| EARL "PEANUTT" MONTGOMERY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:18-cv-284 |
| ) | Judge Aleta A. Trauger |
| NANCY JONES, CONCORD BICYCLE ) | |
| ASSETS, LLC, CONCORD MUSIC ) | |
| GROUP, INC., d/b/a ROUNDER ) | |
| RECORDS, and CRACKER BARREL ) | |
| OLD COUNTRY STORE, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Nancy Jones, Concord Bicycle Assets, LLC ("Concord"), Concord Music Group d/b/a Rounder Records ("Rounder"), and Cracker Barrel Old Country Store, Inc. ("Cracker Barrel") have filed a Motion to Dismiss (Docket No. 14), to which Earl "Peanutt" Montgomery has filed a Response (Docket No. 27), and the defendants have filed a Reply (Docket No. 29). For the reasons set out herein, the defendants' motion will be granted in part and denied in part.

## I. BACKGROUND AND PROCEDURAL HISTORY[1]

Montgomery is a songwriter, musician, and producer. He was an original member of the "Fame Gang," a group of studio musicians credited with creating the "Muscle Shoals sound." For the majority of the 1960s and 70s, Montgomery was a "friend, band-member, co-writer, confidante, [and] running buddy" of the now-deceased singer George Jones. Montgomery composed seventy-three songs that have been recorded by Jones, thirty-eight of which were released to radio stations as singles. (Docket No. 1 ¶¶ 8–10.)

---

[1] The facts set out herein are taken from Montgomery's Complaint (Docket No. 1) and are taken as true for the purposes of the Motion to Dismiss.

In the late 1970s, Jones and Montgomery both found themselves in moments of transition. Jones was "between recording contracts," meaning that he had the right to record new music without its rights immediately reverting to a record label. Montgomery, for his part, was apparently reaching the end of the time in which his professional life would be so thoroughly structured around Jones. Jones proposed that, as a "retirement package" to Montgomery, Montgomery would serve as the producer of a new album recorded by Jones with the Smoky Mountain Boys, the backing band for musician Roy Acuff, and Montgomery would have ownership of the recording "to do with as he wished." (*Id.* ¶ 11.)

Around 1978 or 1979, Montgomery, Jones, and the Smoky Mountain Boys recorded the album, consisting of twelve tracks, in Hendersonville, Tennessee. Montgomery retained a copy of the original mixed version of the album, but the 2" master tapes of the recording were left in a vault at the recording studio—which, Montgomery states, was the custom at the time. Unfortunately for Montgomery, Jones, shortly thereafter, re-signed with CBS Records, bringing into question whether any other person or entity had a right to release new music by Jones or under Jones' name, even with Jones' personal approval. The album went unreleased. (*Id.* ¶¶ 12–14.)

In 1981, Montgomery contacted Jones's record label about the possibility of Montgomery's using Jones's name and likeness to release the George Jones/Smoky Mountain Boys album. The label declined to grant permission for the release. (*Id.* ¶ 17.) That same year, George Jones met his eventual wife, Nancy Jones, one of the defendants in this case. Montgomery blames Nancy Jones for George Jones's growing estranged from many of his previous friends and associates, including Montgomery. (*Id.* ¶ 16.)

In the 1990s, Montgomery tried again to find a path toward releasing the album. He met with MCA Records Nashville President Tony Brown and Chairman Bruce Hinton, and they began discussing the contours of a deal that would have allowed MCA to release the album, with Montgomery receiving $30,000 and the right to additional payment from sales based on his producer credit. Nancy Jones, however, got word of the proposed deal and intervened with Brown to prevent it from going forward. Again, the George Jones/Smoky Mountain Boys album went unreleased. (*Id.* ¶ 17.)

In the mid-2000s, Nancy Jones contacted Montgomery about the album. She stated that she and George would allow Montgomery to release the album, if Montgomery paid the Joneses $100,000. Montgomery declined, on the ground that Nancy Jones's proposal was, in his view, inconsistent with the initial decision by George Jones to give Montgomery ownership of the album in recognition of their years of work together. (*Id.* ¶¶ 20–21.)

In 2013, George Jones died. Somewhere along the line, a man named Joey Burks had inherited, from his father, the recording studio that had retained a copy of the master tapes of the George Jones/Smokey Mountain Boys album. Burks had no knowledge of Jones's understanding with Montgomery and merely believed that he had had the good fortune to come into possession of unreleased material recorded by the now-deceased George Jones. He contacted Nancy Jones in an attempt to sell her the master for $10,000. Nancy Jones threatened to sue Burks and eventually paid him $1,000 for the tape—giving her, finally, possession of a physical copy of her deceased husband's unreleased recording with the Smoky Mountain Boys. (*Id.* ¶¶ 22–25.)

Eventually, Nancy Jones sold all of her George Jones-related assets—including masters and intellectual property, as well as rights to Mr. Jones's name and likeness—to defendant Concord, for a sum reported to be in excess of $30 million. Attorneys for Concord and

Rounder—a Concord affiliate—contacted Montgomery about Rounder's potentially releasing the album. Pursuant to the companies' proposal, Montgomery would have received a producer credit and the right to some payments for sales, but he would not have been directly compensated for his claimed ownership of the album. Montgomery rejected the offer. (*Id.* ¶ 27.)

Rounder released a version of the album anyway. With the original master recordings in its possession, Rounder was able to add instrumentation, remix the track, and release the album for sale to the public—which it did in partnership with Cracker Barrel, as a release available for purchase only at Cracker Barrel locations. The released album does not credit Montgomery as a producer, instead listing Concord/Rounder executives as "Executive Producer" and "Project Supervisor." The packaging of the album represents it as a "lost" album that was later discovered. (*Id.* ¶¶ 28–31.)

On March 14, 2018, Montgomery filed his Complaint in this case, relying on the court's diversity jurisdiction. (Docket No. 1.) The Complaint alleges that the defendants variously committed the torts of conversion, trespass to chattels, and false light invasion of privacy. (*Id.* ¶¶ 40–43.) Montgomery does not specifically allege copyright infringement. (*Id.*) On May 8, 2018, the defendants moved to dismiss Montgomery's claims. (Docket No. 14.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and

the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

### III. ANALYSIS

#### A. Conversion and Trespass to Chattels

Montgomery argues that Nancy Jones's receipt of the George Jones/Smoky Mountain Boys master tapes from Burks and the corporate defendants' later receipt of the masters from Jones amount to trespass to chattels and/or conversion. He explicitly denies that he is alleging either claim in reference to his intangible rights in the recorded material itself, relying instead solely on his claimed ownership of the physical masters. (Docket No. 28 at 4.) He also concedes that he has not pled a claim for copyright infringement based on the release of the George Jones/Smoky Mountain Boys album. (*Id.* at 3–4.) The only issue before the court, then, is whether he has pled claims on which relief could be granted with regard to the master tapes as

5

physical objects. The defendants argue that those claims are preempted, would fail on the merits, and are barred by the doctrine of laches.

*1. Preemption*

Under § 301(a) of the Copyright Act, a state law claim is preempted if "(1) the work is within the scope of the 'subject matter of copyright,' as specified in 17 U.S.C. §§ 102, 103 . . . and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting 17 U.S.C. § 301(a)). "Courts and commentators have described this preemption analysis as encompassing a 'subject matter requirement' and a 'general scope' or 'equivalency' requirement." *Id.* (citing *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997); 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 1.01[B][1]–[2], at 1-10 to 1-57 (1999)).

The subject matter requirement of § 301 is satisfied if a work fits within the general subject matter of §§ 102 and 103, regardless of whether it qualifies for copyright protection. *Stromback v. New Line Cinema*, 384 F.3d 283, 300 (6th Cir. 2004) (citations omitted). Nevertheless, even if a party's "state law claims concern works within the subject matter of copyright, such claims will only be preempted if they assert rights that are 'equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106[.]'" *Wrench*, 256 F. 3d at 455–56 (quoting 17 U.S.C. § 301(a)). The court applies a "functional test" to determine whether the state law right at issue is equivalent to any of the exclusive rights under § 106. *Stromback*, 384 F.3d at 301 (citing *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1164 (1st Cir. 1994)). "Equivalency exists if the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights." *Id.* at 456.

If, however, "an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim." *Id.* (emphasis added) (citations omitted). The existence of an extra element precludes preemption only where the element changes the nature, rather than the scope, of the action. *Data Gen.*, 36 F.3d at 1164–65.

If Montgomery had asserted state-law torts based solely on the defendants' sale and release of the George Jones/Smoky Mountain Boys recorded material, there would be little doubt that those claims would be pre-empted by federal copyright law. Indeed, much of what Montgomery describes looks like an ordinary copyright dispute. A work was authored, and, over the years, questions about its ownership arose. Eventually, one party started exploiting the work despite another's claim of ownership. If Montgomery had sued to establish his right to royalties from the recorded material or his right to release versions of the album in the future, such a suit would plainly fall within the subject matter of copyright and involve functionally equivalent rights, giving rise to preemption.

Montgomery, though, stresses that he bases his claims entirely on his alleged ownership of the master tapes and the defendants' improper possession and use of those tapes. It is well settled that copyright law recognizes a distinction between a copyright-protected work and the "physical embodiment" of that work, with the subject matter of copyright encompassing only the former. *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 620 (E.D. Va. 2005). Accordingly, the "torts of conversion and trespass are generally not preempted by copyright law because they relate to . . . tangible rather than intangible property." *Id.* (citations omitted). Physical copies of original manuscripts—which may have collectible or historical value distinct

7

from the underlying material—are paradigmatic examples of the types of physical property for which a conversion claim may exist outside the scope of copyright law. 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 1.15[I][1] (2018) ("[A] *manuscript* is subject to wrongful conversion, whereas a *poem* (or other literary work) is subject to copyright infringement." (emphasis in original)). The same reasoning applies to master tapes. *See Eagle Rock Entm't, Inc. v. Coming Home Prods., Inc.*, No. CV 03-00571 FMC (AJWx), 2003 WL 25781234, at *3 n.3 (C.D. Cal. Dec. 12, 2003) ("The owner of the Master Tapes would likely have a conversion claim to recover the actual, physical Master Tapes.").

The defendants argue that Montgomery is merely limiting his allegations to the master tapes "for the sole purpose of defeating a prong of the preemption test" and that his argument, therefore, is "illusory." (Docket No. 29 at 2.) There is nothing illusory, though, about the well-settled, foundational premise that a physical copy of a work remains the subject of ordinary property law, while copyright law governs the work. Montgomery's choice to limit the subject matter of his litigation, moreover, is not just some cosmetic trick. By limiting his claims to the physical master tapes and forswearing any copyright claim, Montgomery has given up quite a bit. He has lost the ability to rely on the Copyright Act's theories of liability or damages. He has lost the right to try to establish, at least in this proceeding, that he has a right to release the album himself. In other words, if Montgomery's theory of recovery was an attempt to smuggle a copyright claim into this case, it did not work. That does not affect the viability of the claims that he *has* pleaded. Montgomery is the master of his own Complaint and he is entitled to assert whichever rights he wishes to assert. He has asserted tangible property rights in specific physical tapes, and the Copyright Act does not preempt such claims.

### *2. Conversion and Trespass to Chattels Regarding Tangible vs. Intangible Property*

The defendants argue next that the court should dismiss these claims because Tennessee does not recognize causes of action for trespass to chattels or conversion based on intangible property. See, e.g., *Ralph v. Pipkin*, 183 S.W.3d 362, 368 (Tenn. Ct. App. 2005) ("[I]n Tennessee, a civil action for conversion, the wrongful appropriation of tangible property, is not recognized for the appropriation of intangible personal property.") (citing *B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 680 (Tenn. Ct. App. 1995)). Again, though, Montgomery's own concessions leave the defendants' arguments beside the point. He concedes that he is not relying on any violation of his intangible rights, only on the allegedly unlawful handling of the master tapes that he left with the recording studio but continued to own. (Docket No. 28 at 5.)

The defendants identify no basis, under Tennessee law, for concluding that an otherwise valid claim for conversion or trespass to chattels would fail merely because the relevant piece of tangible property is also the physical embodiment of a piece of intangible property. Indeed, such a rule would be difficult to justify and lead to results that Tennessee courts, this court imagines, would be unlikely to endorse. For example, under such a rule, one person would be unable to sue another for stealing a book, a painting—or maybe even a computer, since the computer would be full of copyright-protected software. The court does not believe that the Tennessee Supreme Court, if asked, would recognize such a senseless exception to the ordinary rules of property torts. Montgomery's claims, therefore, do not fail merely because the master tapes are physical property that embodies intangible property.

The defendants next suggest that, insofar as Montgomery's claims are based solely on his rights in the master tapes as physical objects, he cannot establish damages, because the only meaningful value of the tapes was in the recordings themselves. The defendants argue, without

9

citation to law, that, even if Montgomery had retained possession of the tapes, the defendants "presumably" could have "taken appropriate legal measures" to force him to allow them to access and use the recordings to release the album, without payment to him. (Docket No. 29 at 5.) They do not describe what those appropriate legal measures would be or why Concord and Rounder would have the right to force Montgomery to grant them access to property that he lawfully owned and that he was not using in any way that infringed on any copyright.

Moreover, the argument that the tapes are worthless is belied by the fact that so many people appear to have felt differently. At least as the facts have been alleged by Montgomery, MCA Records executives felt it was appropriate to pay Montgomery at least $30,000, not adjusted for inflation, in order to release the album—a strange position to take if Montgomery's rights were worthless. Joey Burks tried to sell the tapes for $10,000, and, while Nancy Jones threatened to sue him, she still paid him $1,000 for them—when they were not even clearly his to sell. Indeed, the very fact that this album went unreleased for over thirty years is inconsistent with the premise that the possession of the tapes was some unimportant detail. The question of damages in this case will depend on factual details regarding music industry custom and practice, as well as a much fuller explication of the rights of the respective parties than the defendants have offered.

Finally, the defendants argue that Montgomery abandoned the tapes. The Tennessee Supreme Court "has defined abandonment as the 'intentional relinquishment of a known right." *Griffis v. Davidson Cty. Metro. Gov't*, 164 S.W.3d 267, 278 (Tenn. 2005) (quoting *Carroll County Bd. of Educ. v. Caldwell*, 162 S.W.2d 391, 393 (Tenn. 1942)). "The inquiry whether abandonment has occurred is predominantly a factual determination based upon all the relevant circumstances. *Id.* at 279–80 (citing *Coile v. Hudgins*, 70 S.W. 56, 57 (Tenn. 1902); 1 Am. Jur.

2d Abandoned, Lost, and Unclaimed Property § 41 (2004)). A finding of abandonment does not, however, require an affirmative statement of intent to abandon. Abandonment "may be inferred from the acts and conduct of the owner, which are clearly inconsistent with an intention to continue the use of the property, and from the nature and situation of the property." *Id.* at 281–82 (quoting 1 Am. Jur. 2d Abandoned, Lost, and Unclaimed Property § 43 (2004)).

The defendants argue that Montgomery abandoned the master tapes by leaving them so long in the recording studio. Montgomery has alleged, however, that he was merely following industry practice, and the court is required to accept that assertion as accurate for the purposes of a motion to dismiss. Simply leaving an item in what is the equivalent of storage, even for a very long time, is not necessarily sufficient evidence to demonstrate an intent to relinquish one's ownership of the item. The court cannot conclude, as a matter of law, that the tapes were abandoned.

*3. Laches*

Under Tennessee law, the defense of laches is based on the equitable principle that a court "will not intervene on behalf of one who has delayed unreasonably in pursuing his rights." *Long v. Bd. of Prof'l Responsibility of Supreme Court*, 435 S.W.3d 174, 181 (Tenn. 2014) (quoting *Dennis Joslin Co. v. Johnson*, 138 S.W.3d 197, 200 (Tenn. Ct. App. 2003)). "The defense of laches is based on the doctrine of equitable estoppel, and is only applied where the party invoking it has been prejudiced by the delay." *Assocs. Asset Mgmt. LLC v. Blackburn*, No. W2016-00801-COA-R3-CV, 2017 WL 1077060, at *2 (Tenn. Ct. App. Mar. 22, 2017) (quoting *Brown v. Ogle*, 46 S.W. 3d 721, 726 (Tenn. Ct. App. 2000)). Tennessee courts recognize that laches applies "only in comparatively rare cases." *Id.* (citing *S.M. Williamson & Co. v. Ragsdale*, 95 S.W.2d 922 (Tenn. 1936)). The "[t]wo essential elements of fact" necessary to support a

laches defense are "negligence and unexcused delay on the part of the" plaintiff and "injury in the party pleading laches." *Id.* (quoting *Freeman v. Martin Robowash, Inc.*, 457 S.W.2d 606, 611 (Tenn. Ct. App. 1970)).

The defendants liken this case to another in which Montgomery was involved, *Nunley v. Estate of Nunley*, 925 S.W.2d 538 (Tenn. Ct. App. 1996). In that case, a dispute arose regarding who possessed the mechanical royalty[2] rights for a catalog of songs that Montgomery had written between 1970 and 1975, including the song "One of These Days," which the Court of Appeals characterized as having become a "huge hit" when recorded by Emmy Lou Harris. *Id.* at 539–40. A man named Billy Gene Nunley had long claimed that he had purchased the royalty rights from Montgomery, and, for a period of over fifteen years, Nunley received those royalties, while Montgomery did not. Montgomery admitted that he realized, sometime in the 1970s, that he had stopped receiving mechanical royalty checks for the relevant songs, although he claimed that, at the time, he had been unaware of why the payments had stopped. Montgomery did not sue anyone to recoup his rights until seventeen years later, when he became caught up in litigation between Nunley and Nunley's ex-wife regarding the royalties. Montgomery—whom the ex-wife had named in a contempt petition because she suspected he was conspiring with Nunley against her—filed a cross-claim and a counter-claim against the Nunleys, respectively, alleging that the rights had been his all along. *Id.* at 540–41. The Court of Appeals held that Montgomery's claims were barred by laches. *Id.* at 542.

This case bears almost no resemblance to *Nunley*, outside of the superficial similarity that both involve Montgomery and music he composed or recorded in the 1970s. In *Nunley*, Montgomery was aware that his rights had been contravened for seventeen years before bringing

---

[2] "Mechanical royalties" are royalties paid for the sale of a copy of a recorded song, in contrast with "performance royalties," which are based on the song's being played or broadcast—for example, over the radio. *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 508 F. Supp. 798, 800 nn.3&4 (S.D.N.Y. 1981).

suit. Here, he alleges that he voluntarily left the master tapes to be held by the studio, which they were until 2013. The rights at issue in this case, therefore, did not even begin to be violated until about five years before the suit was filed, when Nancy Jones obtained the tapes without Montgomery's consent. Admittedly, Montgomery did not, then, immediately file suit. There is no reason, however, to conclude, at least at this stage, that his delay was unreasonable. The facts as Montgomery has set them forth suggest that, after the defendants gained control of the masters, Montgomery and Rounder engaged in further discussions that might have led to a satisfactory result for all involved. The court will not assume that a delay of a few years, during much of which there may still have been some hope of resolving the situation without litigation, was so unreasonable as to justify the rarely-appropriate defense of laches. That is especially true on a motion to dismiss, where the court has no evidence of any party's state of mind or the prejudice, or lack thereof, suffered by the defendants. The court, accordingly, will not dismiss Montgomery's claims due to the laches defense, although the plaintiffs may raise it again, if they wish, at a stage in the proceeding in which a factual record will be available.

### **B. False Light Invasion of Privacy**

Tennessee recognizes the claim of false light invasion of privacy as a cause of action separate and distinct from defamation, to protect the rights of plaintiffs who "have had attributed to them certain qualities, characteristics, or beliefs that, while not injurious to their reputation, place those persons in an undesirable false light." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001). In Tennessee, a false light claim requires that the defendant gave publicity to the plaintiff that placed the plaintiff in a false light, that the false light is highly offensive to a reasonable person (as determined objectively), and that the defendant acted with knowledge or reckless disregard for the falsity of the publicized matter (as determined

subjectively). *Id.* at 643–44 (quoting the Restatement (Second) of Torts (1977), § 625E); *see also Seaton v. TripAdvisor, LLC*, 728 F.3d 592, 601 (6th Cir. 2013); *Winslow v. Saltsman*, No. M2014-00574-COA-R3-CV, 2015 WL 6330403, *5 (Tenn. Ct. App. Oct. 21, 2015). "[P]laintiffs seeking to recover on false light claims must specifically plead and prove damages allegedly suffered from the invasion of their privacy." *West*, 53 S.W.3d at 648 (citations omitted).

Montgomery argues that Rounder and Cracker Barrel committed false light invasion of privacy by failing to identify him as the producer of the released version of the George Jones/Smoky Mountain Boys album and representing the album as a "lost" recording, rather than a recording that was always known to exist but that had never been released for legal and/or business reasons. The defendants argue that Montgomery has failed to state a claim for false light invasion of privacy because (1) he has failed to identify any statements that would be highly offensive to a reasonable person and (2) he has failed to plead damages.

With regard to the characterization of the album as "lost," the court agrees that no reasonable juror could conclude that the language used was highly offensive. Using the term "lost" to refer to a previously unreleased part of a deceased artist's work, despite the fact that the material was never actually physically lost, is, at worst, merely the use of dramatic marketing language, not anything highly offensive. Moreover, such a characterization is not even clearly false in this instance. The recordings of the Jones/Smoky Mountain Boys album *were* lost, in a sense, at least to Jones himself and his record labels. The two known copies remained, respectively, locked away in a Tennessee recording studio and tightly held by an estranged former collaborator. Calling that album "lost" is a fair use of an ambiguous term.

In contrast, a reasonable juror might consider it highly offensive to release a creative professional's work without properly crediting him. The only damages related to that statement

that Montgomery seeks, however, are "compensatory damages 'for damage to the intrinsic value of the master recordings" [resulting from the mass unauthorized sale of the album which was compiled from the contents of the master tapes] 'in no event less than $500,000.00.'" (Docket No. 28 at 10 (quoting Docket No. 1 at 7 (alteration in original)).) By Montgomery's own description, those damages were not caused by the failure to credit him on the album, but by the album's release itself. He has, therefore, failed to plead damages arising out of the alleged false light invasion of privacy.

While Montgomery generically asks for leave to amend his Complaint to correct any deficiencies (Docket No. 27 at 1), he proposes no facts that he would plead to satisfy his failure to assert actual damages arising out of Rounder and Cracker Barrel's failure to credit him on the released album. The court, therefore, will dismiss his false light invasion of privacy claims in full.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Docket No. 14) will be granted in part and denied in part. His claims for false light invasion of privacy will be dismissed, and all other claims will remain pending.

An appropriate order will enter.

ENTER this 18th day of January 2019.

ALETA A. TRAUGER
United States District Judge